MILES EHRLICH (Cal. Bar No. 237954)
miles@ramsey-ehrlich.com
AMY E. CRAIG (SBN 269339)
amy@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

*Attorneys for Defendant Rose Lin*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROSE LIN,<br>   also known as Rose Sweihorn Tong,<br><br>Defendant. | Case No. 21-CR-0227 WHA<br><br>**DEFENDANT ROSE LIN'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(a)** |

## Table of Contents

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 3

      i.      Upbringing in Asia.................................................................................. 3

      ii.     Life as an Immigrant in the United States ............................................. 3

      iii.    Ms. Lin's Late Entry into the Professional World .................................. 4

      iv.    Ms. Lin's Return to Asia and Start of JHL ............................................. 5

      v.     The Impetus for JHL .............................................................................. 5

    B.     Procedural Background.......................................................................... 6

      i.      Genentech Lawsuit and Aftermath ......................................................... 6

      ii.     Criminal Case against Ms. Lin............................................................... 6

III.    THE LEGAL STANDARD ................................................................................. 7

IV.     PLEA AGREEMENT AND GUIDELINES RANGE......................................... 10

    A.     The Plea Agreement............................................................................. 10

    B.     The Presentence Report and Applicable Guidelines Range ................ 10

V.      THE SECTION 3553(A) FACTORS STRONGLY FAVOR A DOWNWARD
    VARIANCE ...................................................................................................... 10

    A.     Nature and Circumstances of the Offense. .......................................... 11

    B.     History and Characteristics of the Defendant. .................................... 12

      i.      Ms. Lin is an Exceptional Mother and Grandmother ............................ 13

      ii.     Ms. Lin Has a Long History Of Helping Those In Need......................... 14

      iii.    Ms. Lin Has Always Used Her Funds to Provide For Others.................. 15

    C.     The Purposes of Sentencing—Just Punishment, Specific Deterrence, and General
      Deterrence. ........................................................................................... 16

D.    The Need to Avoid Unwarranted Sentencing Disparities.....................................17

      i.    Ms. Lin's Conduct is Distinct from that of Her Co-Defendant, Racho Jordanov.......................................................................................................17

      ii.    Ms. Lin's Affirmative Choice to Leave the Safe Haven of Her Home Country and Face Her Punishment in the U.S. is Unusual for Foreign Residents Living in Non-Extraditing Countries ......................................17

E.    The Need to Provide Restitution to Any Victims of the Offense. ........................18

F.    The Types of Sentences Available.........................................................................19

VI.    CONCLUSION............................................................................................................21

# Table of Authorities

**Cases**

*United States v. Carty,* 520 F.3d 984 (9th Cir. 2008) ...................................................... 7

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................... 7

*Kimbrough v. United States*, 552 U.S. 85 (1997). .......................................................... 7

*Koon v. United States*, 518 U.S. 81 (1996) ..................................................................... 7

*United States v. Ameline,* 409 F.3d 1073 (9th Cir. 2005) .............................................. 8

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) ................................................... 8

*United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006) .............................................. 8

*United States v. Ruff,* 535 F.3d 999 (9th Cir. 2008) ...................................................... 8

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ................................................. 8

*United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) ............................................. 8

**Rules**

Rule 11 ......................................................................................................................... 10

**Statutes**

18 U.S.C. §3553................................................................................................... *passim*

## I.     INTRODUCTION

On August 17, 2021, Rose Lin signed a plea agreement taking responsibility for her role in a conspiracy involving the theft and use of trade secrets from Genentech and the concealment of those acts from Sanofi, a lead investor in JHL Biotech ("JHL"), the Taiwanese company Ms. Lin co-founded in 2012.  Ms. Lin understands the gravity of her crime.  She stands ready to accept the sentence this Court will fashion to hold her accountable for her wrongdoing and deter others from engaging in the same criminal conduct.

Under the terms of her plea agreement, the government has agreed to seek a lesser sentence for Ms. Lin than the one it recommends for her co-defendant, Racho Jordanov. That provision reflects a determination that Ms. Lin's conduct, while unquestionably serious, does not rise to the same level of culpability as that of Mr. Jordanov.  The Probation Office joins in the government's assessment in that regard.  And both the government and the Probation Office recommend that this Court impose a sentence that is substantially lower than the reference Guidelines term.  That joint recommendation is based on several factors, including Ms. Lin's extraordinary acceptance of responsibility, demonstrated lifetime of charitable deeds, and the nature of her offense conduct as compared to her co-defendants.

Ms. Lin is a citizen and longtime resident of Taiwan, a county that has no extradition treaty with the United States.  Like many others facing charges outside their home country, Ms. Lin could have chosen to remain outside the reach of U.S. prosecutors and this Court's jurisdiction.  Indeed, when she learned of the government's investigation, Ms. Lin had been living in Taiwan for more than a decade.  But rather than stay in Taiwan, Ms. Lin, at age 73, chose to voluntarily return to the United States to answer the charges against her.  Perhaps even more remarkably, Ms. Lin also volunteered to truthfully answer questions (without limitation) from the prosecutors during three lengthy sessions – at a time when she knew she was a target of the government's investigation, and believed (correctly) that the government had already secured an under-seal indictment against her.

Ms. Lin's actions, while extraordinary, are in keeping with her strong sense of personal integrity and accountability. Over the course of her 73 years, she has repeatedly overcome hardships, and no matter how dire her own circumstances, she has always continued to provide for others in their times of need.

We trust, that in fashioning a just sentence, this Court will take into account Ms. Lin's lesser relative culpability, her extraordinary acceptance of responsibility, and her lifetime of good deeds. Ms. Lin submits that these factors, along with the fact that she has provided restitution to the victims of her crime, are more than sufficient to demonstrate that the objectives of sentencing can be met in this case with a twelve-month period of home confinement, without the need to impose a formal custodial sentence.

 In making this request, Ms. Lin is not asking to escape the consequences of her conduct. Rather she submits that she can deliver a far more powerful message of deterrence to others in the biotech industry by using her period of home confinement to speak about the personal and corporate consequences that result from the use of another company's trade secrets. Ms. Lin is uniquely situated to make this pitch. She knows firsthand, and bears personal responsibility for, the devastation that JHL's use of Genentech's trade secrets wreaked upon JHL's mission, its employees, and its investors, including ultimately the abandonment of the four biosimilar cell lines that the company had spent six years developing, multiple felony convictions, and a custodial sentence for her co-founder and life partner. We submit that Ms. Lin's sharing of her story, in both the United States and Taiwan, will have a broader and greater deterrent effect on others tempted to follow in her footsteps, than were she to personally serve time in federal prison.

For all of these reasons, as well as concerns regarding Ms. Lin's physical and mental health (discussed in more detail below), we submit that a sentence of 12 months of home confinement, a fine of $10,000 (double the amount recommended by Probation), and a substantial community service requirement is "sufficient" and also "no greater than necessary" to fulfill the statutory objectives embodied in the federal sentencing process.

## II.     BACKGROUND

### A. Personal Background

#### i.     Upbringing in Asia

Ms. Lin, though an American citizen, was born in China and raised in Taiwan. Dkt. 35 (PSR) ¶ 68.  In August 1949, when Ms. Lin was just a year old, her father and mother fled China with their six children to escape the civil war between the Communists, under Mao Zedong, and the Kuomintang (KMT)-led government of the Republic of China. *Id.* ¶ 69.  The family managed to secure passage by boat to Taiwan, but they had to leave behind all of their other family members and all material possessions.  *Id.*

Once in Taiwan, Ms. Lin's family began to establish roots.  Ms. Lin's father worked as a school principal and later became a county-level head of education.  Ms. Lin's mother stayed at home to raise Ms. Lin and her six siblings (the youngest of whom was born in Taiwan).  Ms. Lin's material needs were met adequately, but the family had no money for any extras.  Ms. Lin and her siblings would wear the same clothes for three to four years. *Id.*  But Ms. Lin and her siblings felt no sense of shame or hardship from these circumstances.  They were raised to care little for material possessions, but rather to value education more than anything.  Ms. Lin and every one of her siblings graduated from college.  *Id.* Ms. Lin earned her pharmacy degree from China Medical University in Taiwan in 1971.   *Id.*

#### ii.     Life as an Immigrant in the United States

Shortly after she graduated, Ms. Lin married Tom Tong, one of her classmates from China Medical University.  *Id.* ¶ 70.  In 1973, Ms. Lin and her husband immigrated to the United States.  *Id.*  Ms. Lin wanted her future children to have a better education and broader life opportunities than she had.  *Id.* Ms. Lin and her husband settled in San Francisco and went on to have three daughters.  *Id.* When they arrived in the United States, both Ms. Lin and her husband worked as food servers in a Chinese restaurant.  *Id.* Mr. Tong eventually became an insurance agent.  And later, after their third daughter was born, Ms. Lin stayed home to raise the children.

During these years, Ms. Lin's husband began to spend exorbitant amounts of money on

himself, his insurance office, and several women with whom he had affairs. *Id.* Eventually, he could no longer maintain his lavish lifestyle, and in 1983 he filed for bankruptcy. Following his bankruptcy, Ms. Lin's husband went back to Taiwan, abandoning Ms. Lin and their three young daughters (then aged 3, 7 and 10 years old) in San Francisco without any savings, credit, stable housing, or even a working phone line. *Id.*; Exhibit B at 4-5 (Lilian Kee letter); 20 (Emmie Pei letter).

> ### iii. *Ms. Lin's Late Entry into the Professional World*

After being abandoned by her husband, Ms. Lin's situation was so dire that her parents urged her to place her three daughters in foster care. PSR ¶ 75. But Ms. Lin refused. Instead, she swallowed her pride and accepted assistance and food stamps from the state to house and feed her daughters until she could get on her feet. *Id.* ¶ 70. Ms. Lin suffered from depression during this period. She was accustomed to being self-reliant and it pained her to not be able to provide for her daughters. But she was determined to forge a path forward. She dedicated herself to improving her English and creating community for her daughters. Exhibit B at 6 (Lilian Kee letter). Through her church she met another immigrant from Taiwan who, like Ms. Lin, had obtained his pharmacy degree before coming to the United States. PSR ¶ 72. When Ms. Lin learned that Genentech was willing to hire him despite his lack of a degree from the United States, Ms. Lin immediately applied for a job there. She was offered a temp job as a swing shift technician. And a few months later, at the age of 39, Genentech offered Ms. Lin a fulltime position, which she eagerly accepted. *Id.;* Exhibit A (Rose Lin letter).

Her work for Genentech focused primarily on clinical manufacturing, specifically "fill finish" – which is the process of filling products into vials in a clean room environment, and then inspecting, labeling, and packaging them. Exhibit A. At Genentech, Ms. Lin sought to learn everything she could to become a valued employee. She asked incessant questions of her co-workers, trying to soak up as much knowledge as possible and do everything in her power to become an expert in clinical manufacturing. Her daughter Christine recalls Ms. Lin spending time on the weekends looking up words and phrases that she had jotted down the previous week

at work in her Chinese-English dictionary. Exhibit B at 6 (Letter from Lilian Kee). Ms. Lin's efforts paid off. She was eventually promoted to shift supervisor, then senior manager.

    *iv.*  *Ms. Lin's Return to Asia and Start of JHL*

  In 2009, after twenty-two years at Genentech, Ms. Lin, then 61, began to feel pressure to retire. Although she was reluctant to do so, Ms. Lin ultimately accepted a 6-month severance package the Company offered to older employees to incentivize early retirement. But she was not ready to stop working. As a woman in her sixties, who had only ever worked for one company, and for whom English was her second language, Ms. Lin lacked confidence in her ability to find another job. Bu then an acquaintance approached her about working for a company in Taiwan named Eusol. Eusol was looking for someone to supervise the fill process and certain other aspects of the contract manufacturing process – a job that perfectly matched Ms. Lin's skillset from her two decades at Genentech. PSR ¶ 83; Exhibit A. Although the idea of relocating to Asia, far from her daughters and grandchildren was daunting, Ms. Lin did not want to pass up the opportunity to remain in the workforce. In December 2009, she accepted the position and returned to Taiwan after thirty-five years in the United States.

    *v.*  *The Impetus for JHL*

  Once back in Asia, Ms. Lin rebuilt her community and spent a significant amount of time with her two siblings who had remained in Taiwan. It was at her brother's urging that Ms. Lin and her partner Racho Jordanov, began to explore ways in which they could use their collective experiences to address an unmet need in the Asia market. Exhibit A. Ms. Lin had met Mr. Jordanov when she was still working for Genentech. After her daughters moved out of the family home, Ms. Lin decided to rent out her daughters' old rooms and use the rental income to fund a charity she was starting. PSR ¶ 74. Ms. Lin posted her room-for-rent in the Genentech newsletter and Mr. Jordanov responded to the ad. He moved in and the two developed a friendship that later turned into a romantic relationship.

  Unlike Ms. Lin, whose professional experience was limited to supervising the manufacturing process, Mr. Jordanov had extensive experience in overseeing the construction of

manufacturing facilities and the implementation of production processes by Contract Manufacturing Organizations ("CMOs"). They ultimately decided that their complementary backgrounds were well-suited to create a company focused on manufacturing biosimilars (generic versions of biologics) by using different cell lines and processes to create far more affordable versions of therapies already on the market. Both Ms. Lin and Mr. Jordanov were excited by the prospect of bringing life-saving therapies to developing countries at affordable prices, as well as the opportunity to utilize the skills they had accumulated over the course of their careers. Because neither had any experience developing a business plan or approaching investors, they asked one of Mr. Jordanov's former colleagues to collaborate with them on a business model. The resulting company became JHL (representing each of their last names) Biotech.

Given Ms. Lin's background in clinical manufacturing, once the company was up and running, she served as the General Manager for JHL's Taiwan plant. PSR ¶ 83. She served in that role for the for the duration of her time at the company. In mid-2018, a few months before she separated from the Company, that Ms. Lin was also given the title of Chief Operating Officer. *Id.*

## B. Procedural Background

### i. *Genentech Lawsuit and Aftermath*

On October 29, 2018, Genentech filed a lawsuit against JHL, Xanthe Lam, Allen Lam, James Quach, Racho Jordanov, John Chan and Ms. Lin. *Genentech v. JHL Biotech,* 18-CV-6582-WHA (Dkt. 1). The centerpiece of the lawsuit was the allegation that Xanthe and Allen Lam had stolen Genentech's trade secrets for JHL's use. *Id.* On the same day as the complaint was filed, the U.S. Attorney's Office unsealed an indictment against the Lams, Mr. Quach, and Mr. Chan for theft of trade secrets. *United States v. Lam,* 18-CR-527-WHA (Dkt. 1). Neither Ms. Lin nor Mr. Jordanov was named in that indictment. *Id.*

### ii. *Criminal Case against Ms. Lin*

It wasn't until the summer of 2021 that Ms. Lin learned that she was the target of an

active criminal investigation. Upon learning this, Ms. Lin, through counsel, sought to meet with the prosecutors conducting the investigation so that she could forthrightly answer their questions about her conduct. PSR ¶ 46. Ms. Lin ultimately met with the Assistant United States Attorneys and FBI agents on three separate days. *Id.* ¶ 45. No questions were placed off-limits. Ms. Lin provided detailed responses to the government's inquiries and she openly admitted to what she had done wrong, knowing full well that the government would seek to hold her accountable for that wrongdoing.

Despite knowing that she would be facing serious felony charges, Ms. Lin then voluntarily returned to the United States, without securing any up-front promises from the prosecution regarding the charges she would face or any sentence they would ultimately recommend. Immediately upon her arrival she surrendered both her United States and Taiwan passports. Within days, the government unsealed an indictment against Ms. Lin and she presented herself to the Court to answer those charges. Dkt. 8. Just a few weeks later, Ms. Lin pled guilty to the crimes for which she is now to be sentenced. Dkt. 22.

## III.   THE LEGAL STANDARD

This Court's fundamental task now is to impose consequences that will achieve a just sentence in light of the facts and circumstances of this particular case and this particular offender. The "overarching statutory charge" under 18 U.S.C. § 3553 is for the court to "impose a sentence sufficient, but not greater than necessary" to accomplish the statutory objectives of federal sentencing. *United v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)); *see also Kimbrough v. United States*, 552 U.S. 85, 101 (1997). And in doing so, the Supreme Court has directed sentencing judges to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

The applicable Guidelines range is merely the "starting point and the initial benchmark" in this process. *Gall*, 552 U.S. at 49; *Carty*, 520 F.3d at 991. And sentencing courts are

instructed that they "may not presume" that the Guidelines range is reasonable.  *Gall*, 552 U.S. at 50.  The Supreme Court's decision in *Gall* and its progeny have "breathed life into the authority of district court judges to engage in individualized sentencing" *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (quoting *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (*en banc*)), and confirmed the power of district courts to depart from the Guidelines in appropriate cases.  *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ("any deviation from the applicable advisory guidelines range [is] viewed as an exercise of the district court's post-*Booker* discretion and reviewed only for reasonableness.")

To meet its mandate of imposing a sentence that is "sufficient, but not greater than necessary" the court is directed to consider all of the factors listed in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the kind of sentences available, and the need for the sentence imposed to reflect the seriousness of the offense and afford adequate deterrence.  *See* 18 U.S.C. §3553(a).

In undertaking this analysis, this Court should weigh heavily in the balance the factors that are unique to Ms. Lin—namely, her extraordinary acceptance of responsibility, her efforts to make amends, and her lifetime of charitable acts—since these circumstances are highly relevant to assessing what sort of punishment is reasonable, sufficient, and not greater than necessary. *See, e.g., United States v. Ruff,* 535 F.3d 999, 1001, 1003 (9th Cir. 2008) (history of strong employment, family support), *United States v. Ameline,* 409 F.3d 1073, 1093 (9th Cir. 2005) (Wardlaw, J. concurring and dissenting) ("defendant's family ties and responsibilities, his or her educational and vocational skills, and his or her military, civic, charitable, or public service record" and other factors are "essential to sentencing consistent with 18 U.S.C. § 3553(a)"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (public service and good works, commitment to helping persons in distress).

As a result of the COVID-19 pandemic, courts across the nation have also considered sentences within the context of the increased dangers that custodial sentences pose to those who are incarcerated.  Recognizing these concerns, the Department of Justice has offered guidance

underscoring the need to make use of alternative sentences.  In this regard, the Bureau of Prisons

has "prioritize[d] the use of [its] various statutory authorities to grant home confinement for

inmates seeking transfer in connection with the ongoing COVID-19 pandemic," particularly for

those "at-risk inmates who are non-violent and pose minimal risk of recidivism and who might

be safer serving their sentences in home confinement rather than in BOP facilities."[1]

In keeping with this guidance, individuals over 70 years old, like Ms. Lin, have been one

the first cohorts eligible for transfer to home confinement.  The increased use of home

confinement as an alternative to incarceration provides protection not only for the transferred

inmates, but for all of those incarcerated, as well as for the corrections staff.  And while the

Attorney General's guidance was intended to address those currently incarcerated, the concerns

animating this guidance apply in equal measure to the question of whether a custodial sentence is

appropriate, in the first instance, for a similarly-situated defendant.

The reality is that COVID-19 still poses a grave risk to those incarcerated in federal

penitentiaries.[2]  And the Department of Justice has instructed the BOP "to continue to review at-

risk inmates for placement on home confinement in accordance with the CARES Act and

guidance from the Attorney General."[3]

//

---

[1] Off. of the Att'y Gen., Mem. for Dir. of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020), available at https://www.justice.gov/coronavirus.

[2] *See, e.g.,* Walter Pavlo, *Statistics Show Federal Bureau Of Prisons Unable To Implement Key Policies During Crisis* (February 7, 2022), available at https://www.forbes.com/sites/walterpavlo/2022/02/07/statistics-show-federal-bureau-of-prisons-unable-to-implement-key-policies-during-crisis/?sh=36927adb7585  ("[E]ven those who are vaccinated are prone to being reinfected if they are in tight living quarters with those who become infected and are not vaccinated. Prisons present an environment where people are exposed to higher doses of infection that can overwhelm their dose of vaccine protection.")

[3] U.S. DOJ Mem., Federal Bureau of Prisons, Memorandum for Chief Executive Officers, Home Confinement (April 13, 2021), available at https://www.fd.org/sites/default/files/news/2021.4.13_-_bop_home_confinement_cares_memo.pdf

ROSE LIN'S SENTENCING MEMORANDUM
Case No. CR 21-227-WHA

## IV. PLEA AGREEMENT AND GUIDELINES RANGE

### A. The Plea Agreement

Ms. Lin entered into a Plea Agreement under Federal Rule of Criminal Procedure 11(c)(1)(B). Dkt. 22 (Lin Plea Agreement). Under the terms of that agreement, Ms. Lin is not limited in what sentence she can ask the Court to impose. The government, in turn, has agreed "not to recommend a sentence that exceeds the sentence" it recommends for Ms. Lin's co-defendant, Racho Jordanov. *Id.* ¶ 7. Mr. Jordanov's plea agreement, in contrast, is a Rule 11(c)(1)(C) agreement that requires Mr. Jordanov to be sentenced to a custodial sentence of between six and 18 months[4], to be followed by a period of home confinement of between six and 36 months. Dkt. 21 (Jordanov Plea Agreement).

### B. The Presentence Report and Applicable Guidelines Range

Ms. Lin has just one objection to the factual recitations in the Probation Officer's Presentence Report: Ms. Lin's birthday is October 3, not October 31. Dkt. 35 (PSR) at 3.

Ms. Lin agrees with the Probation Officer's calculation of the applicable guidelines.[5] Her total offense level is 27; she has no criminal history; her advisory guidelines term is therefore 60 months. PSR, ¶ 88. The fine range for her offense is from $25,000 to $250,000. *Id.* ¶ 95

## V. THE SECTION 3553(A) FACTORS STRONGLY FAVOR A DOWNWARD VARIANCE

Here, both the government and the Probation Office have recommended that the Court impose a sentence of a year and a day, a sentence substantially below the applicable Guidelines range. PSR; Dkt. 37 Is making its recommendation, the Probation Office cites "Ms. Lin's age, community support, and her voluntary return to the United from Taiwan to face the consequence of her actions." PSR, Sentencing Recommendation at 2. The Probation Office also cites the fact that Ms. Lin's conduct, while serious, did not rise to the same level of culpability as that of her

[4] This provision is the subject of a stipulation between the government and Mr. Jordanov following Mr. Jordanov's cancer diagnosis that post-dated the initial plea agreement.

[5] Ms. Lin is dropping her one objection noted in the PSR. And dhe joins in the arguments set forth in Mr. Jordanov's sentencing memo detailing why the Probation Office's calculation of the applicable loss/gain is correctly calculated. Dkt. 38 at 3-6.

co-defendant, Mr. Jordanov. *Id.*

Ms. Lin recognizes that she must be held accountable for her role in the conspiracy with punishment that is meaningful and sufficient. We respectfully submit, however, that a custodial sentence of a year and a day does not give sufficient weight to the truly unique circumstances here – including the compelling factors cited in the PSR, but also her lifetime of exceptional generosity, her physical and mental health, and her concrete plans for continuing to make amends after the imposition of her sentence. For the reasons detailed below, we submit that all of those factors, taken together, demonstrate that 12 months of home confinement, coupled with a fine of $10,000 and a substantial community service requirement, would be sufficient and not greater than necessary to comply with the statutory purposes of sentencing in this case.

**A. Nature and Circumstances of the Offense.**

When this investigation began, it was premised on the allegation that Ms. Lin had personally recruited Xanthe and Allen Lam to loot Genentech's trade secrets for the benefit of JHL. But this characterization of Ms. Lin as the driver or mastermind of Xanthe and Allen Lam's theft from Genentech was never borne out. This is because it was never true. The Lams have now pled guilty to the crimes they committed. *United States v. Lam,* 18-CR-527-WHA, Dkt. 179 (Xanthe Lam Plea Agreement) and Dkt. 180 (Allen Lam Plea Agreement). In the combined 65-page statement of facts accompanying their guilty pleas, the Lams acknowledge that Ms. Lin never asked them to steal from Genentech and that *they never even told her* that they had done so. *Id.* The truth is that Ms. Lin was in the dark about the Lams' theft of trade secrets from Genentech. But that is not to say Ms. Lin is blameless. She is not.

Ms. Lin knowingly allowed Xanthe Lam to work for JHL while still employed at Genentech. When Ms. Lam declined to quit Genentech to come work fulltime for JHL, Ms. Lin should have accepted that Ms. Lam could not ethically work for JHL and Genentech at the same time. Instead, Ms. Lin agreed to let Ms. Lam consult for JHL, knowing full well that Genentech would not want a current employee moonlighting for a competitor. Ms. Lin then exacerbated this bad decision by agreeing to actively conceal Ms. Lam's work for JHL by allowing her to be

paid through her husband, Allen Lam, and route communications to and from Ms. Lam using her husband's email account as a cover.  Ms. Lin acknowledges that she knew her actions were wrong, but she did it anyway.  Exhibit A (Rose Lin Letter).

While Ms. Lin never personally stole or used any trade secrets, and did not instruct others to do so, when she became aware that others at JHL, including her partner Racho Jordanov, illegally possessed and used Genentech's trade secrets, she took no steps to stop it.  At the time, Ms. Lin rationalized the behavior occurring in the company, and she clung to the justification offered by others that the Genentech SOPs being copied were just "boilerplate."  *Id.*  But the reality is that Ms. Lin wanted JHL to succeed and she was willing to let JHL cut corners to make that happen.  Those cut corners victimized Genentech and proved disastrous to JHL and its biggest investor, Sanofi.  In the aftermath of Genentech's discovery of JHL's use of its trade secrets, Ms. Lin bore witness to the quick demise of the company she had worked so hard to build.  And as part of its settlement with Genentech, JHL destroyed all four cell lines it had been developing for six years and agreed to abandon its efforts to create biosimilars of Genentech's biologics Rituxan, Pulmozyme, Avastin, and Herceptin.  PSR ¶ 22.  Genentech's suit, and its aftermath, forced Ms. Lin to come to terms with the fact that through their actions, she and Mr. Jordanov "had stolen from Genentech," and in the process "sabotaged our ability to create unique biosimilars that could have benefited society and [] hurt our investors." Exhibit A (Rose Lin Letter).

## B.  History and Characteristics of the Defendant.

The knowledge that her own actions contributed greatly to JHL's downfall has devastated Ms. Lin.  *Id*.  After dedicating her life to helping others, and being a model employee, it was extraordinarily painful to see how much harm her conduct caused.  It ran contrary to everything she has stood for and the values she instilled in her three daughters.

Despite all the hardship she has faced in her life, Ms. Lin has always prided herself on being a good person who puts the welfare of others above her own needs. Her daughter Lilian writes that Ms. Lin has "always been eager to give generously – not only out of her finances

(even when things were already tight for the family) but also her time and heart .. . ." Exhibit B at 6 (Lilian Kee letter). Ms. Lin's daughter Christine likewise describes her mother as "a good-hearted, compassionate, hardworking single mother who provided for her children" and who was "always willing to help people who are less fortunate." Exhibit B at 3 (Christine Loria letter).

> i.   *Ms. Lin is an Exceptional Mother and Grandmother*

As reflected in her daughters' letters, even as she forged a career for herself, Ms. Lin took the time to be present in her daughters' lives and instill in them her core values of learning and service to others. Christine, Ms. Lin's middle daughter, was valedictorian of her high school class. Exhibit B at 21 (Grace Wang letter). All three girls graduated from college and established professional careers of their own. Ms. Lin's oldest daughter, Tricia, writes that her decision to dedicate her career to helping disadvantaged teens was "a direct byproduct of the virtues my mom instilled in me as a child," specifically her mother's instruction "not to judge people based off of their status or wealth, but to focus on character and integrity. . . [because] people were more important than things and that relationships were more important than money. . . ." *Id.* at 1 (Tricia Lam letter).

Ms. Lin has been an equally positive influence in the lives of her grandchildren. Her grandson, Timothy Chen, shares that he was "always excited to visit her because I knew she was genuinely interested in becoming close to me and forming a real relationship." *Id.* at 15 (Timothy Chen letter). Timothy's sister, Emily, writes that Ms. Lin encouraged her to "use my strengths and skills and pursue a career that would change lives for the better." *Id.* at 18 (Emily Chen letter)

Throughout her life, Ms. Lin also remained a dutiful daughter to her own parents. As they got older and needed assistance, she regularly traveled back to Taiwan to care for them. When her father was ill and dying, she put her own obligations on hold to be with him until he passed. *Id.* at 12 (Lin Yu Hong (Anne Song) letter). And she continues to honor her promise to him, as she has throughout her life, to take care of other family members.

//

### ii.    Ms. Lin Has a Long History Of Helping Those In Need

Even when finances were extremely tight as a single mother raising three daughters in San Francisco, Ms. Lin did not hesitate to welcome relatives into her home.  Her niece, Amy Wang, shares that when her family first immigrated to America in 1978, Ms. Lin "took us into her home and helped my parents find jobs and helped my brother and I enroll in the neighborhood schools in San Francisco.  We lived with her for a year until my parents could save enough money to rent a small apartment . . . ."  *Id.* at 10 (Amy Wang letter). Years later, when Amy was 16, her parents sent her to stay with Ms. Lin for what was supposed to be a short visit. Instead, Ms. Lin's sister decided it would be best for Amy to move in with Ms. Lin permanently. Ms. Lin did not balk at this imposition, nor did she accept any money for her niece's care.  She raised Amy as a fourth daughter and gave her a home until her niece got married ten years later. *Id.* at 10 (Amy Wang letter) and 12 (Lin Yu Hong (Anne Song) letter.)

Ms. Lin's nephew similarly describes how Ms. Lin invited him to live with her, rent-free, in her home in South San Francisco, enabling him "to get out from under a mountain of debt and bring stability to both [his] career and life." *Id.* at 13 (David Lin letter). Timothy Chen, Ms. Lin's grandson, likewise recalls how Ms. Lin "opened her home to my mom, sister, and me to stay in for several months during a particularly turbulent period in our live." *Id.* at 15 (Timothy Chen letter).

Ms. Lin's willingness to offer her home as a refuge to those in need traces back to her youth.  As a child in Taiwan, Ms. Lin would regularly bring home classmates who didn't get enough to eat at home so that her mother could feed them.  *Id.* at 17 (Judy Liu letter).  When she was a teen, Ms. Lin discovered that a schoolmate was subjected to inappropriate advances from the girl's stepfather.  After learning of her classmate's plight, Ms. Lin jumped into action, convincing her family to let the girl come live with them.  Ms. Lin's classmate ended up staying with Ms. Lin's family for two and a half years, until the girl was able to safely graduate from high school and go off to college.

Similarly, Ms. Lin's daughter Christine writes that "[m]any of my childhood memories

were of friends living with us because they needed a place to stay. Whether it be a bed to sleep in, an ear to listen or a meal for her friend's children, my mom always wanted to help." *Id.* at 2 (Christine Loria letter). Lilian, Ms. Lin's youngest daughter, echoes this sentiment, sharing that "[t]hroughout my childhood, my mother hosted and brought in relatives, friends, and even colleagues of hers to live in our home who needed financial or emotional support." *Id.* at 6 (Lilian Kee letter).

      *iii.*    *Ms. Lin Has Always Used Her Funds to Provide for Others*

Ms. Lin has never been motivated by the desire to accumulate wealth.  Virtually any time she had extra funds, she would give them away to someone more in need.  When her older sister got married, Ms. Lin gave what was then her entire savings to them as a wedding present. *Id.* at 17 (Judy Liu letter); 16 (Jessie Liu letter).  When her sister's husband was hospitalized, Ms. Lin sent several thousand dollars, unprompted, to spare her sister from worry.  *Id.* at 17. Ms. Lin's niece shares that Ms. Lin has even co-signed loans for friends with poor credit, knowing that she would bear the consequences if they were to default, "but willingly accepting that risk because they need[ed] her." *Id.* at 16.

Once her daughters were grown, Ms. Lin spread her charity even farther beyond her own circle of friends and acquaintances.  In 2006, she founded a non-profit, called TLC (representing her daughters' initials), to cover all educational costs for students in China, Ms. Lin's country of birth, who otherwise could not afford to attend school.  PSR ¶ 74; Exhibit B at 2 (Christine Loria letter); 13-14 (David Lin letter).  TLC has since expanded to fund scholarships in other developing nations, but its mission remains the same: to identify individuals without resources and provide the funds necessary to help them attain the tools and means to climb out of poverty. Between 2012 and 2021, JHL has made it possible for 400 students around the world to attend school.  PSR ¶ 74.  Ms. Lin personally donated more than $340,917.03 of her own money to make that possible.  *Id.; PSR, Sentencing Recommendation at 2.

TLC was borne out of Ms. Lin's appreciation for the assistance she received from the government and her church community when she found herself destitute with three young

children to raise.  Ms. Lin humbly accepted the aid provided to her until she was able to stand on her own two feet.  It was then, at her lowest point, when she was most dependent on others, that Ms. Lin resolved to assist others who found themselves in the same situation if she could ever attain financial security herself.  TLC is just one way in which Ms. Lin fulfilled that promise.  And it represents the type of person that Ms. Lin is: someone who lives a principled life, someone who holds herself accountable to others, and someone who does not hesitate to sacrifice to help others more in need.

### C.  The Purposes of Sentencing—Just Punishment, Specific Deterrence, and General Deterrence.

Ms. Lin's deeply-ingrained resolve to do what is right has deepened her shame at her own failure to do so while in a position of responsibility and control at JHL.  The fact that Ms. Lin will now and forever face her daughters as a convicted felon heightens that shame.  There is simply no chance that Ms. Lin will ever again step afoul of the law.  Ms. Lin is also cognizant of the need for this Court to fashion a sentence that would deter not just her, individually, but others who might be tempted to commit similar crimes in the future.  As both an American and Taiwanese citizen, and someone who is fluent in the language of both countries, Ms. Lin is uniquely situated to educate other entrepreneurs about the disastrous consequences of using another company's trade secret and proprietary information when starting a company, even when the victim might be 6,000 miles away.

In telling her story, Ms. Lin can share her firsthand knowledge of the devastating consequences that JHL suffered as a result of its use of Genentech's trade secrets: the costly litigation that ultimately resulted in the agreement to destroy all four of the cell lines it had spent six years developing and the fact that she and her co-founder, Mr. Jordanov, became convicted felons.  Suffice to say, Ms. Lin is well-situated to motivate others entering the biotech industry, both in the United States and Asia, to show zero tolerance for any use of another company's intellectual property.

//

Rose Lin's Sentencing Memorandum
Case No. CR 21-227-WHA

**D. The Need to Avoid Unwarranted Sentencing Disparities**

      *i.  Ms. Lin's Conduct is Distinct from that of Her Co-Defendant, Racho Jordanov*

Section 3553(a)(6) also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, the Probation Office acknowledges that, although Mr. Jordanov and Ms. Lin pled guilty to the same conduct, Mr. Jordanov is the more culpable of the two. *See, e.g.,* PSR, Sentencing Recommendation at 2. This fact is likewise reflected in the differing terms of each defendant's plea agreement. While Mr. Jordanov's requires the imposition of a custodial sentence, Ms. Lin's does not. Dkt. 21, ¶ 7 *cf.* Dkt. 22, ¶ 7.

Ms. Lin's conduct is also distinct in some other ways from that of certain defendants in the related case of *United States v. Lam*, in that she did not personally take, use, or disseminate Genentech trade secrets. Nor, unlike Mr. Jordanov, did Ms. Lin herself sign a false representation and warranty to Sanofi attesting that JHL had never used any other company's intellectual property. Ms. Lin's conduct was unquestionably criminal. It was simply of a different character than the conduct engaged in by her co-defendants. Nevertheless, Ms. Lin readily acknowledges that she was complicit in, and culpable for, the illegal objectives of the conspiracy to which she has pleaded guilty.

      *ii.  Ms. Lin's Affirmative Choice to Leave the Safe Haven of Her Home Country and Face Her Punishment in the U.S. is Unusual for Foreign Residents Living in Non-Extraditing Countries*

More broadly, Ms. Lin's conduct in responding to this prosecution differs markedly from that of most individuals who come before this Court in that she voluntarily submitted herself to the clutches of the United States Department of Justice and to the jurisdiction of this Court. Most defendants have no other choice: if charged with violating the law, they are arrested and brought to court to answer for their conduct. Ms. Lin had a very different choice. When she learned that the U.S. Attorney's Office was targeting her in an ongoing investigation, she had been living in Taiwan, a non-extraditable country, for over a decade. Ms. Lin was not just a resident of Taiwan; she enjoys citizenship there. She was raised and educated there, and two of

her siblings still live there.  Ms. Lin could have elected to live the remainder of her life comfortably in Taiwan, receiving visits from her children and grandchildren from the U.S., and she would thus have remained far from the American judicial system.  Instead, she returned to the United States to take responsibility for—and make amends for—her misconduct, even at the cost of exposing herself to prison time.

In short, Ms. Lin voluntarily took a path that very few foreign-born residents of non-extraditable countries charged with violating U.S. laws have proven willing to follow.  In doing so, she placed her trust in the American justice system.  That faith has been borne out by the fair manner in which both the government and the Probation Office have considered and addressed her misconduct, as well as the other admirable qualities of her character, beyond her worst deeds. Given her unique circumstances, Ms. Lin is thus also uniquely positioned to serve as an example to foreign residents that if they choose to face pending charges and hold themselves accountable, then the American justice system will treat them fairly.

**E.  The Need to Provide Restitution to Any Victims of the Offense.**

In the plea agreement with Ms. Lin, the government agreed not to seek a restitution judgment if Ms. Lin entered into settlement agreements with the victims of her crimes, which she has done.  Dkt. 22 ¶ 7.   Both Genentech and Sanofi have informed the Probation Office that they are fully satisfied with the restitution Ms. Lin has provided.  PSR ¶¶ 42-43.

In light of these settlements, the government is not requesting any additional restitution. The Probation Office likewise has not identified the need for additional restitution, but asks that this Court impose a $5,000 fine.  PSR, Sentencing recommendation at 2. The relatively low fine amount reflects the reality of Ms. Lin's financial situation and her diminished prospects for future wages.  *Id.* (citing Ms. Lin's "age, fixed income . . .  lack of healthcare coverage aside from Medicare, and her need to pay for not only ordinary living expenses going forward, but also any home health care workers and/or residence in an assisted living facility she requires as she ages.")

As set forth in the PSR, Ms. Lin is not a wealthy woman.  Her one-time wealth on paper

due to her shares in JHL never transformed into actual money.  And Ms. Lin has since returned to JHL all of the shares she once owned.  PSR ¶ 14.  Other than her home, which she purchased in the mid-1990s, Ms. Lin has no other large assets.  She does not even own a car, and instead uses a bicycle to run errands.  *Id.* ¶ 73.  Now that she is back in the United States, she must plan for medical expenses that may arise given her declining health.  *Id.* Sentencing Recommendation at 2. As a resident of Taiwan, Ms. Lin's health care, including her double hip replacement, was covered by the state.  Here, by contrast, Ms. Lin had to pay several thousand dollars out of pocket when she was hospitalized after her fall in September.  *Id.* ¶ 78.

Nevertheless, despite her limited means, Ms. Lin proposes that the Court impose a fine of $10,000 ($5,000 more than that recommended by the Probation Office) to reflect the seriousness with which she takes this matter and her deep desire to make amends.  A $10,000 fine is a significant sum of money for someone of Ms. Lin's limited means, particularly in light of the restitution she has already paid in full to the victims of her crime.

**F. The Types of Sentences Available.**

Given her age and the fact she poses no risk to the community, Ms. Lin fits squarely within the Attorney General's guidance regarding the type of individual for whom home confinement is appropriate.  Ms. Lin's health conditions, specifically her degenerative disc disease, is another reason that home confinement is warranted.  Ms. Lin's condition continues to cause her chronic pain.  *Id.* ¶ 78.  Her physician has recommended that she exercise daily and take long walks to manage her condition.  That advice would be near impossible to follow if Ms. Lin were incarcerated.  Federal penitentiaries are not ideal settings for adhering to a healthy diet and cardiovascular exercises even in the best of times.  The COVID-19 pandemic has made conditions even more challenging.  Over the past two years, penitentiaries have been on near-constant lockdown, resulting in inmates being confined to their cells for 23-24 hours a day.[6]  And

---

[6] *See e.g.,* Jean Casella And Katie Rose Quandt, *Prisons' Use of Solitary Confinement Explodes with the COVID-19 Pandemic, While Advocates Push for Alternatives* (April 10, 2020), https://solitarywatch.org/2020/04/10/prisons-use-of-solitary-confinement-explodes-with-the-covid-19-pandemic-while-advocates-push-for-alternatives/; *see also* Robert Barton, *Frequent Prison Lockdowns Backfire. I Know From Experience*, February 2, 2022,

even as the pandemic is beginning to recede, staff shortages have resulted in additional lockdowns.[7]

Incarceration under any conditions could prove detrimental to Ms. Lin's mental health. Incarceration now, when lockdowns have become a standard part of the BOP's response to the pandemic, could prove even more damaging.[8]  As described in the PSR, over the past several years, Ms. Lin experienced suicidal ideation due to the shame she experienced in reflecting upon her misconduct and the tremendous harm it has caused.  PSR ¶ 75; 79.  At her daughter's urging, Ms. Lin began mental health counseling, which, along with the support of her family, has helped alleviate these feelings.  *Id.* ¶ 75.  But Ms. Lin's family worries that the isolation of incarceration could reverse these gains.  *Id.*  Home confinement would allow Ms. Lin to continue in therapy and access the support of her family, while also continuing to make amends for her conduct.

---

https://www.politico.com/news/agenda/2022/02/10/frequent-prison-lockdowns-backfire-00007797  ("[A] lockdown means everyone in a unit or an entire prison is restricted to their cells for 22 to 24 hours a day, without access to education, recreation, or communication with family.")

[7] *See e.g.,* Walter Pavlo, *Statistics Show Federal Bureau Of Prisons Unable To Implement Key Policies During Crisis,* February 7, 2022, https://www.forbes.com/sites/walterpavlo/2022/02/07/statistics-show-federal-bureau-of-prisons-unable-to-implement-key-policies-during-crisis/?sh=36927adb7585 ("The BOP is now on a national lockdown, there is a shortage of workers to tend to these overcrowded facilities, and tensions are high among prisoners who have been living under restricted COVID-19 conditions (lockdowns, limited programming, limited access to family interaction and limited recreation); *see also* Keri Blakinger, Jamiles Lartey, Beth Schwartzapfel, Christie Thompson and Tom Meagher of The Marshall Project and Michael R. Sisak and Michael Balsamo of The Associated Press,  *US prisons are facing staff shortages as officers quit during pandemic,* November 21, 2021, https://www.wgal.com/article/us-prisons-are-facing-staff-shortages-as-officers-quit-during-pandemic/38121669#  ("Inside prisons, growing shortages mean a rise in lockdowns. Restrictions that might have begun as a way to stop the spread of COVID-19 have continued because there aren't enough guards to supervise activities.")

[8] *See e.g.,* Katja Ridderbusch, "COVID precautions put more prisoners in isolation. It can mean long-term health woes," National Public Radio (October 4, 2021), available at https://www.npr.org/sections/health-shots/2021/10/04/1043058599/rising-amid-covid-solitary-confinement-inflicts-lasting-harm-to-prisoner-health; *see also* Danya Issawai and Derek M. Norman, "In Vermont, Isolating Inmates Kept Covid at Bay, but a Price," The New York Times (April 21, 2021), https://www.nytimes.com/2021/04/21/us/vermont-prison-covid.html,

## VI.    CONCLUSION

Ms. Lin recognizes that she committed a serious offense that warrants a significant penalty.  She submits, however, that a sentence of 12 months of home confinement, with an obligation to use that time to speak to others about her misdeeds and the devastating consequences that followed, and a $10,000 fine, adequately meets the Court's mandate to fashion a sentence that is "sufficient" and "no greater than necessary" to fulfill the statutory objectives of federal sentencing.